UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

DAVID PURDY,

        Plaintiff,

v.

CITY OF KALAMAZOO,
DANIEL WESTON, and
A. LEE KIRK,

        Defendants.
_____/

Case No. 1:07-CV-316

Hon. Richard Alan Enslen

**OPINION**

        Let us see clearly the deeds of our public officers, and not from afar.

        This matter is before the Court on the separate Motions for Summary Judgment filed by the City of Kalamazoo and the individual Defendants, Daniel Weston and A. Lee Kirk. The Motions have been fully briefed, including supplemental briefing, and oral argument is unnecessary in light of the extensive briefing. *See* W.D. Mich. L. Civ. R. 7.2(d).

**FACTUAL BACKGROUND**

        Plaintiff David Purdy is an erstwhile employee of the City of Kalamazoo Department of Public Safety ("KDPS"). Purdy worked for KDPS between September 1992 and October 4, 2002 as Deputy Chief of Police. (Sec. Am. Compl. ¶¶ 8 & 24.) Purdy's work ended with KDPS after Chief Daniel Weston prepared a negative employment evaluation for Purdy, though the evaluation was never formally signed because the City of Kalamazoo and Purdy instead agreed to his eventual resignation in lieu of further evaluation or discipline. (*See* City of Kalamazoo, Br. in Supp. of Summ. J., Ex. A at 1.) The terms of the resignation agreement were that Purdy would resign and in

exchange for the resignation and a release of liability relating to his employment termination, the City would provide him certain pay and employee benefits, would further provide a letter of recommendation and reference, and would direct future employment inquiries to the Chief of Public Safety, who "shall, upon receiving such contacts, corroborate the statements made in the letters of recommendations." (Agreement ¶ 4.)

Plaintiff left Kalamazoo to work in Jamaica and then applied for the Chief of Police position in Rockford, Illinois. (Sec. Am. Compl. ¶ 32.) The City of Rockford determined to offer Plaintiff the position predicated upon his passing a background examination by the International Association of Chiefs of Police ("IACP"). (*Id.* at ¶¶ 38, 48.) The job offer was then withdrawn after a Freedom of Information Act ("FOIA,") request by the IACP revealed the negative unofficial evaluation of Purdy by Weston. (*Id.* at 46-51.)

The above withdrawal of job offer occurred not long after testimony and public statements by Purdy in favor of minority officers who were suing the City of Kalamazoo for civil rights violations and racial discrimination caused by Daniel Weston. (Sec. Am. Compl. ¶ 26; Purdy 12/9/2005 Aff. ¶ 37; Pl.'s Ex. 9.) Purdy's supporting Affidavit and a transcribed telephone call between Purdy and Jerry McNeely (a local pastor who was concerned about racism within KDPS) were discussed in a January 23, 2006 Memorandum from Daniel Weston to Lee Kirk, which Memorandum described Purdy's statements as "inaccurate" and in some cases "ridiculous." (Weston Mem. 3-8.) Kirk also interviewed Purdy by telephone on January 23, 2006 at 8:00 a.m. and asked Purdy about his statements to Jerry McNeely and particularly, ". . . why [have] you brought this forward at this time, almost five years after the fact?" (Pl.'s Ex. 13 at 6.)

Notwithstanding, Purdy did provide the IACP with two release forms which authorized its receipt of personnel information from KDPS. The first release was signed on January 24, 2006 and provided in pertinent part:

> I authorize the IACP to contact individuals and institutions that may have information relevant to my qualifications for the job for which I am applying. I further authorize contacted individuals and institutions to give IACP any and all information concerning my previous employment or any other pertinent information they may have, personal or otherwise, and release all parties from all liability for any damage that may result from furnishing such information.

(IACP Authorization & Waiver for Release of Info., dated 1/24/2006.) This release form also contained an acknowledgment that the performance of a background investigation constituted consideration for the broad release of claims made. (*Id.*)

Purdy also approved a second release form on March 9, 2006, which authorized a private company (Cloud, Feehery & Richter, Inc. acting for the IACP) to obtain his employment record and personnel files from former employers. The form likewise provided:

> I authorize without reservation any agencies contacted to furnish the above mentioned information and release all parties involved from any liability and responsibility for doing so. This authorization and consent shall be valid in either an original, fax or photocopy form.

(CFR Release, dated 3/9/2006, at 1.)

In terms of the timing of the release of personnel information by the City of Kalamazoo, the release coincided with a FOIA request made by a reporter for the Rockford Register Star (Bob Schaper) as well as the FOIA requests made by the IACP. (Sec. Am. Compl. ¶ 40; Aff. of Daniel Weston ¶ 25.) Weston's role in connection with the release of information was to provide his employment file to the City Attorney's Office and allow their independent review of the FOIA requests. (Weston Aff. ¶¶ 34-36.) It was Lee Kirk's direction to Weston which resulted in Weston

sending KDPS personnel documents regarding Purdy to Kirk's office for FOIA review. (*Id.* at ¶ 41.)  While Kirk typically handled media requests, it appears that the Rockford Register Star's request and perhaps also the IACP's request were eventually processed by his assistant Randall Schau during Kirk's sick leave for a surgery. (Kirk Dep. 54-55.) Nevertheless, it also appears that Schau processed the requests in accordance with Kirk's usual broad interpretation of FOIA requests as encompassing all employment documents and not merely the human resources file. (*See* Kirk Dep. 25.)  This practice was developed as part of Kirk's program of broad FOIA statutory interpretation and compliance. (*Id.*)  That is, over 17 years of processing FOIA requests, Kirk customarily gathered and disclosed all personnel data from both the human resource department file (referred to as the "official personnel file") and the unofficial personnel file kept by KDPS.[1] (*Id.*)

After Purdy's disputed 2001 personnel review was publicized, Kirk advised KDPS officials (and City officials too) not to discuss Purdy's workplace performance. (Pl.'s Ex. 26.)  Weston followed Kirk's direction and did not speak with investigators or reporters regarding Purdy. (Defs.' Br. in Supp. of Summ. J. 10.) Other KDPS officers likewise did not speak with the media. (*Id.* at 10-11.) One KDPS officer, James Mallory, did speak generally to IACP investigators about Purdy and his information corroborated some negative information in the 2001 disputed performance review. (*Id.*)

---

[1] On March 9, 2006, Purdy requested his "complete" personnel file from the City of Kalamazoo; that request was forwarded to the personnel department and he received back only the official personnel file and not the larger file with the negative review. (Sec. Am. Compl. ¶¶ 43-45.)

**STANDARDS FOR SUMMARY JUDGMENT**

Defendants' Motions are brought pursuant to Federal Rule of Civil Procedure 56.  Under the language of Rule 56(c), summary judgment is proper if the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  The initial burden is on the movant to specify the basis upon which summary judgment should be granted and to identify portions of the record which demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The burden then shifts to the non-movant to come forward with specific facts, supported by the evidence in the record, upon which a reasonable jury could find there to be a genuine fact issue for trial.  *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).  If, after adequate time for discovery on material matters at issue, the non-movant fails to make a showing sufficient to establish the existence of a material disputed fact, summary judgment is appropriate.  *Celotex Corp.*, 477 U.S. at 323.

In assessing evidence, credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences are jury functions.  *Adams v. Metiva*, 31 F.3d 375, 382 (6th Cir. 1994).  The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in the non-movant's favor.  *Celotex Corp.*, 477 U.S. at 323 (quoting *Anderson*, 477 U.S. at 255).  The factual record presented must be interpreted in a light most favorable to the non-movant.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

**LEGAL ANALYSIS**

Plaintiff's Complaint involves only three federal counts (Counts One-Three) and only two federal claims since the third count is premised on establishing municipal liability for Count Two.

The two federal claims are for: (1) retaliation for opposing unlawful and discriminatory employment practices in violation of Title VII of the Civil Rights Act of 1964 as codified at 42 U.S.C. § 2000e-3(a), (Sec. Am. Compl. ¶¶ 55-61); and (2) retaliation for the exercise of First Amendment speech as to matters of public concern, (Sec. Am. Compl. ¶¶ 62-67).

**A. Title VII Retaliation**

Section 704(a) of the Civil Rights Act of 1964 provides:

It shall be an unlawful employment practice for an employer to discriminate against

any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a).

Although this provision ostensibly protects "employees" from employer retaliation, it has been interpreted, consistent with its statutory history, as likewise protecting former employees who assist in the prosecution of civil rights claims of another employee by testifying against the former employer. The United States Supreme Court held in *Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997) that the protection of the "employee" under section 704(a) likewise extended to former employees testifying in favor of Title VII complaints against a former employer. The exact context of *Robinson* was similar to the present case–the former employee was retaliated against by the employer through the use of a negative employment reference. *Id.* at 339-40.

More recently, in the case of *White v. Burlington Northern & Santa Fe Ry. Co.*, the Sixth Circuit Court of Appeals, like this Court, read *Robinson* as extending the protection of section 704(a) to prevent retaliation in the form of false and negative employment references against a former employee.  364 F.3d 789, 810-11 (6th Cir. 2004).  *See also Thompson v. North Am. Stainless, LP*, 520 F.3d 644, 647 (6th Cir. 2008) (extending *White* to apply to retaliation against closely-related persons).

With the above qualifications, the elements of a Title VII retaliation claim are as follows:

> (1) [the plaintiff] engaged in activity protected by Title VII; (2) this exercise of protected rights was known to the defendant; (3) the defendant thereafter took adverse employment action against the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action.

*Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007) (citing *Morris v. Oldham County Fiscal Court,* 201 F.3d 784, 792 (6th Cir. 2000)).

As with other Title VII claims, the Sixth Circuit applies the *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973) burden-shifting analysis to Title VII retaliation claims.  Under this analysis,

> If the plaintiff succeeds in making out the elements of a prima facie case, "the burden of production of evidence shifts to the employer to 'articulate some legitimate, nondiscriminatory reason' for its actions."  *Morris,* 201 F.3d at 792-93 (quoting *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)).  If the defendant satisfies its burden of production, the burden shifts back to the plaintiff to demonstrate "that the proffered reason was not the true reason for the employment decision."  *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 256, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981).

*Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007).

In marching through the legal analysis on the above factual scenario, several points are beyond peradventure. First, the initial creation and filing of the arguably false negative performance review does not qualify as an "adverse action" because Plaintiff at that time was not engaged in protected conduct which was known to Defendants. Second, the providing of testimony and evidence to civil rights plaintiffs in the *Prevo* suit in December 2005 and January 2006 does qualify as "protected conduct" under Title VII, which was known to Defendants at that time (given the inter-office memorandum discussing the conduct). Third, the disclosure of the complete personnel file to background investigators for the IACP did cause Plaintiff to lose new employment with the City of Rockford, Illinois.

Nevertheless, there are two other important questions pertaining to this particular set of facts. First, whether the waiver forms executed by Plaintiff were effective in waiving Plaintiff's claims against Defendants? And, second, whether the particular disclosure of personnel information pursuant to the state FOIA constitutes a "legitimate, nondiscriminatory reason" for the supposed retaliatory conduct by Defendants?

This Court answers both questions in the affirmative. In the Title VII context, reviewing courts have examined a number of circumstances to determine whether releases were knowingly and voluntarily signed. These circumstances include:

> (1) plaintiff's experience, background, and education; (2) the amount of time the plaintiff had to consider whether to sign the waiver, including whether the employee had an opportunity to consult with a lawyer; (3) the clarity of the waiver; (4) consideration for the waiver; as well as (5) the totality of the circumstances.

*Adams v. Philip Morris, Inc.*, 67 F.3d 580, 583 (6th Cir. 1995) (citing *Bormann v. AT & T Communications,* 875 F.2d 399 (2d Cir. 1989) and *Riley v. American Family Mut. Ins. Co.,* 881 F.2d 368 (7th Cir. 1989)).

Notwithstanding the broad scrutiny of releases that the case law invites, the present record does not provide any basis for questioning the validity of the two releases signed by Plaintiff. Plaintiff was and is a sophisticated applicant for a police chief position with extensive experience in public police administration. Plaintiff was presented the release as part of an arm's length hiring process, and had the opportunity to consult counsel, whether or not he chose to do so. The waiver language was broad and clear in its import. Although Plaintiff was not paid consideration as part of the two releases, he received significant consideration for approving the releases–the use of IACP's background investigation services in connection with his potential future employment. This consideration was expressly acknowledged in the first release form. Overall, there is no significant evidence in this record suggesting that the two releases were anything other than knowing, voluntary and binding releases by Plaintiff.

Further, as mentioned above, the IACP releases contained broad language releasing both the IACP and any information suppliers from any liability for any potential claims. Broad language of this kind covered all the Defendants in this suit for any potential liability for damage resulting from the disclosure of the negative information. *See, e.g., Romska v. Opper*, 594 N.W.2d 853, 856 (Mich. App. 1999) (affirming dismissal of third parties based upon similarly broad release language). Because the federal retaliation claims against Defendants are based upon the release of negative information to the IACP and the resulting failure of Plaintiff to obtain employment, all of Plaintiff's Title VII retaliation claims are covered by the broad release language.

9

Even apart from those releases, though, Defendants are protected from liability as to their FOIA disclosures because those disclosures constitute, as a matter of law, a legitimate non-discriminatory basis for Defendants' conduct.[2] The evidence of record shows only that Defendants Kirk, Schau and Weston acted as responsible public officials in complying with FOIA disclosure requirements, which included the required disclosure of the complete, official and unofficial, personnel file to investigators and the media.

Section 1 of the FOIA statute states in pertinent part:

> It is the public policy of this state that all persons, except those persons incarcerated in state or local correctional facilities, are entitled to full and complete information regarding the affairs of government and the official acts of those who represent them as public officials and public employees, consistent with this act. The people shall be informed so that they may fully participate in the democratic process.

Mich. Comp. Laws § 15.231(2). These state provisions mirror federal FOIA provisions, *see* 5 U.S.C. § 552, which likewise seek to provide the public full disclosure regarding the affairs of government and its official actors. *See Rugiero v. U.S. Dep't of Justice*, 257 F.3d 534, 543 (6th Cir. 2001) (discussing policy and provisions of federal FOIA).

This legislative preference for full disclosure to the public is borne out in the state FOIA case law, which too demands broad disclosure in most circumstances. A few cases are typical of the rules of law and results. In *Detroit Free Press, Inc. v. City of Southfield*, 713 N.W.2d 28, 32-37 (Mich. Ct. App. 2005), the Michigan Court of Appeals held that the names of the top police and fire department retirees, together with their pension amounts, were subject to FOIA disclosure. It did so while holding that this information was not subject to a FOIA exemption for personnel records

---

[2]Furthermore, as argued in Defendant City of Kalamazoo's Supplemental Response, the release of FOIA documents and requested personnel records had been handled in a consistent manner by the City of Kalamazoo. ( See Def. City of Kzoo. Suppl. Reply 2-4.)

of law enforcement agencies because it construed this exemption as not applicable to former employees. *Id.* It also upheld the trial court's ruling that, even if the personnel information were exemptible, the exemption should not apply because of the statutory language of the state FOIA which allowed the exemption to be overruled if the public interest in disclosure outweighed the officer's privacy interest. This conclusion was based upon the determination that the public had a strong interest in knowing how its tax dollars were being spent. *See id.* at 36. *See also Taylor v. Lansing Board of Water & Light*, 725 N.W.2d 84 (Mich. Ct. App. 2006) (holding that personnel records of Board of Water & Light were not exempt from disclosure).

Another similar case is *Herald Co., Inc. v. Ann Arbor Pub. Schs.*, 568 N.W.2d 411, 414-15 (Mich. Ct. App. 1997), which held that a performance review of a public school teacher was subject to FOIA and was not subject to a privacy exemption. The latter ruling was premised on the fact that the teacher was a public figure whose performance of his duties was a matter of legitimate public concern. *Id.* In doing so, the Michigan Court of Appeals cited with approval the prior decision by the Michigan Supreme Court in *Swickard v. Wayne County Med. Exam'r*, 475 N.W.2d 304 (1991). The *Swickard* decision determined that the privacy exemption did not apply to an autopsy report of a deceased district judge with narcotics in his blood stream given the strong public interest in its disclosure. *Id.* at 314.

An even more apposite case is that of *Herald Co., Inc. v. Kent County Sheriffs Dep't*, 680 N.W.2d 529, 532-33 (Mich. Ct. App. 2004). It involved the question of whether police department personnel records of a police deputy investigated for involvement with prostitutes was subject to FOIA disclosure or exempt under the police personnel record exemption. The Court of Appeals found that the records were subject to disclosure because the public interest in disclosure outweighed

the interest in non-disclosure. *Id.* (citing Mich. Comp. Laws § 15.243(1)(s)(ix)). This disclosure was, as noted, consistent with the general policy of disclosure under FOIA. *Id.*

Turning to the facts of this case, the law yields a similar conclusion. Since the people of the State of Michigan have a legislatively endorsed right to full disclosure of the deeds of their government, including high ranking police officials, it is little surprise that Mr. Kirk came to the ready conclusion that the balance between disclosure and non-disclosure of Mr. Purdy's personnel records, and especially the 2001 unofficial performance review, tipped in favor of disclosure. The Court finds as a matter of law that this conclusion was correct and that the records in question were subject to mandatory FOIA disclosure given the strong interest of the public in discovery of the deeds of a former deputy police chief, and the deeds of the former police chief in his review of his deputy. The latter subject is particularly salient since racial controversies were an important matter of public interest affecting the police department from 2001 through 2007. The FOIA disclosure was not exempt since the public interest favoring disclosure outweighed any interest favoring non-disclosure. Furthermore, while Plaintiff disputes the accuracy of the 2001 performance review, that document, whether or not in the official personnel file, is exactly the kind of document that FOIA requires a FOIA compliance officer to disclose. The public has a strong interest in knowing whether the deeds of its police leaders are lemons versus lemonade. The negative tone of the 2001 review and the odd circumstance of its preparation bespeak circumstances that the press, the public and public investigators had a strong interest in knowing and discussing. Likewise, a former police employee's interests in non-disclosure of the review, though significant, is not sufficient to trump the people's right to know under FOIA. The performance review is especially important in light of

contemporary controversies within KDPS about racism and the treatment of subordinate officers who raise racial concerns.

Given the above conclusion, the Court determines that Purdy's Title VII retaliation claim cannot succeed as a matter of law since Defendants had a clear legal obligation to disclose the existing performance review upon receipt of the FOIA requests. This legal obligation also constitutes, as a matter of law, a legitimate non-discriminatory basis for the disclosure of the negative performance review through FOIA. As such, Count I fails as a matter of law.

### B. First Amendment Retaliation/ 42 U.S.C. § 1983 Constitutional Claims

As the Sixth Circuit said in its *Taylor* decision, proof of a claim of First Amendment retaliation requires the plaintiff to prove three elements:

> First, the employee must establish that his speech is protected. To accomplish this, the employee must show that his speech touches on a matter of public concern, *Connick v. Myers,* 461 U.S. 138, 147 (1983), and demonstrate that his interest in the speech outweighs the government's countervailing interest in promoting the efficiency of the public service it provides as an employer. *Pickering v. Bd. of Ed. of Twp. High School Dist. 205,* 391 U.S. 563, 574 (1968). This determination is a question of law for the court to decide. *Connick,* 461 U.S. at 148 n.10. Second, the employee must show that the employer's adverse action would chill an ordinary person in the exercise of his First Amendment rights. *Cockrel v. Shelby County Sch. Dist.,* 270 F.3d 1036, 1048 (6th Cir. 2001). Finally, the employee must present sufficient evidence to create a genuine issue as to whether his speech was a substantial or motivating factor in the employer's decision to discipline or dismiss. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977).

*Taylor v. Keith,* 338 F.3d 639, 643 (6th Cir.2003).

Upon reflection of these legal standards, it is clear that the record does not support liability of Defendants for First Amendment retaliation for the reasons identified above plus one. First, the releases were effective in releasing Defendants from liability for the disclosures of the negative

performance review.  Second, Defendants had a legitimate non-discriminatory basis for their disclosures (FOIA compliance) which destroys the connection between the protected speech and negative disclosures.  Third, Defendant City of Kalamazoo cannot be liable because the record does not support any legal basis to make it responsible for the conduct of its officers in making the disclosures.  The Supreme Court has rejected *respondeat superior* section 1983 liability for municipalities.  *See Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 692-94 (1978). Rather, to establish municipal liability under 42 U.S.C. § 1983, a plaintiff must show that the conduct giving rise to liability arose from actual or *de facto* policy of the municipality, *see Monell, supra*, or was due to a failure to train which reflects deliberate indifference to the constitutional rights of the affected persons, *see Canton v. Harris*, 489 U.S. 378, 390-92 (1989).  For the failure to train exception to apply, there must be evidence that the training was inadequate to tasks to be performed, that the inadequacy is the result of deliberate indifference, and the lack of training must be "closely related" or have "actually caused" the plaintiff's injury.  *Matthews v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994).  In this instance, there is no evidence of an inadequate city policy nor is there evidence that any such policy caused or contributed toward the violation of Plaintiff's constitutional rights.  As such, there is no basis for municipal liability.

Therefore, all of Plaintiff's federal claims will be dismissed with prejudice.

**C.  State Law Claims**

Since the Court has determined to dismiss all Plaintiff's federal claims, this leaves only Plaintiff's state law claims (Counts Four-Eight), as to which the Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.  As to these claims, the Court must determine whether to the dismiss

them under 28 U.S.C. § 1367(c)(3).  *See also United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966).

While the Court retains discretion to entertain the state law claims if justice so requires, the Court is of the opinion that it should rather dismiss those claims and leave them to resolution by the Michigan state courts.  This practice best serves the state courts' interests in comity and is most consistent with the long-standing practice of judicial restraint by the federal courts as to matters of state law.  *See Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 357 (1988); *Long v. Bando Mfg. of Am., Inc.*, 201 F.3d 754 (6th Cir. 2000); *Musson Theatrical, Inc. v. Federal Exp. Corp.*, 89 F.3d 1244, 254.  (6th Cir. 1996).

## **CONCLUSION**

For the reasons given, summary judgment will be granted in favor of Defendants as to all federal law claims, and all state law claims will be dismissed pursuant to 28 U.S.C. § 1367(c)(3).

|  |  |
|---|---|
| DATED in Kalamazoo, MI:<br>July 7, 2008 | /s/ Richard Alan Enslen<br>RICHARD ALAN ENSLEN<br>SENIOR UNITED STATES DISTRICT JUDGE |